ROY W. SHEPARD, APPELLANT, v. ANSON L. SHEPARD, APPELLEE.

15 N. W. 2d 195

FILED JULY 7, 1944. No. 31711.

*Brown, Crossman, West, Barton & Fitch* and *Charles E. Foster,* for appellant.

*Rosewater, Mecham, Shackelford & Stoehr* and *J. P. Gibbs, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ.

MESSMORE, J.

This is an action for an accounting, based on a written contract made and entered into January 1, 1938, by Roy W. Shepard, plaintiff, and his brother, Anson L. Shepard, defendant, wherein plaintiff, being the sole owner of the business known as Shepard Laboratories, sold such business to the defendant. The trial court entered a decree in favor of the plaintiff and credited the defendant with certain items as against the net profits due the plaintiff, which were objected to by the plaintiff. Motion for a new trial was overruled, and the plaintiff appeals.

The contract is for the sale of Shepard Laboratories, and the seller retains no title, lien or other security, except a condition wherein certain percentages of the net profits were to be paid as they accrued. First, the case involves an interpretation of the contract. At the outset paragraphs 1 and 2 of the contract, providing for the sale of equipment, office fixtures and merchandise, have been fully complied with. The other provisions of the contract, necessary to a determination of this case, are in substance as follows: The defendant agrees to pay to the plaintiff "for a period of five years on or before December 31st each year, 20% of the profit after deducting the following legitimate neces-

sary business expense itemized as follows for an approximate working basis attached marked No. 3A * * * ." No. 3A is not attached to the contract, nor does it appear as an exhibit. Paragraph 4 of the contract provides that on and after January 1, 1943, the defendant agrees to pay plaintiff "10% of the profit on or before December 31st each year and thereafter for five years after deducting the necessary expenses as outlined in paragraph No. 3 * * * ." Paragraph 5 provides that the parties agree to co-operate with each other in furthering the sales of each other's products, the plaintiff owning a separate company, which will be discussed later in the opinion, with reference to defendant's cross-petition. The other provisions of the contract need not be referred to at this time.

The pleadings joined the issues upon the interpretation of the contract and the accounting, and the evidence details each item constituting the subject matter of the accounting. While some contention is made by defendant in his brief that the action is one at law upon the breach of a contract, the case was tried and considered as in equity.

"Generally speaking, the cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles. It has been said that to this paramount rule all others are subordinate. The parties should be bound for what they intended to be bound for, and no more. * * * The law presumes that the parties understood the import of their contract, and that they had the intention which its terms manifest. It is not within the function of the judiciary to look outside of the instrument to get at the intention of the parties, and then carry out that intention regardless of whether the instrument contains language sufficient to express it; but their sole duty is to find out what was meant by the language of the instrument." 6 R. C. L., sec. 225, p. 835, and cases cited.

The plaintiff contends that the court erred in taking into consideration issues not contemplated by the contract, by admitting the evidence regarding family affairs and sup-

port of the parents. We will not detail this evidence except to say that the obligation is personal to the plaintiff. The defendant paid their mother the sum of $300, charged it as a legitimate business expense, and received credit as against the 20 per cent net profits due the plaintiff, the amount charged to plaintiff being $60. The contract does not provide for such item being a legitimate business expense. Paragraph 7 of the contract provides: "There is nothing in this agreement to make either (plaintiff or defendant) * * * financially responsible for each others indebtedness or responsibilities." In allowing this item the court erred.

The court decreed that for the years 1940, 1941 and 1942 certain depreciation of automobiles should be charged against the plaintiff's 20 per cent profits, and fixed the amounts in the sum of $33 and $42, or a total of $75. The evidence discloses that in the defendant's business he used an automobile, and there is evidence of trade-ins and of mileage of cars at different times and value thereof, and it is contended by plaintiff that the defendant used the same for 75 or 80 per cent of the time for family and personal purposes. The defendant's testimony is that he used the car about 10 per cent of the time for such purposes. He arbitrarily fixed an amount of depreciation; the court fixed and determined a reasonable amount in view of all the circumstances, and the amounts so fixed are about as reasonably accurate as can be ascertained from the record. The decree of the trial court in fixing such amounts for depreciation and use, as shown by the decree, is correct.

The trial court decreed that the defendant use as a credit the sum of $200 for attorneys' fees for his defense of this action as a charge against plaintiff's 20 per cent profits. In this allowance the court erred. The contract does not provide that the defendant would, in any event, be entitled to a credit for attorneys' fees for the defense of any action brought against him by plaintiff, and such amount to be charged against plaintiff's per cent of the profits. The contention that attorneys' fees are allowable under the law of

this state is without merit, and the following authorities are applicable.

In *Higgins v. Case Threshing Machine Co.*, 95 Neb. 3, 144 N. W. 1037, this court said: "It is the practice in this state to allow the recovery of attorneys' fees only in such cases as are provided for by law, or where the uniform course of procedure has been to allow such recovery. As a general rule of practice in this state, attorneys' fees are allowed to the successful party in litigation only where such allowance is provided by statute." See, also, *State ex rel. Charvat v. Sagl*, 119 Neb. 374, 229 N. W. 118; *Blacker v. Kitchen Bros. Hotel Co.*, 133 Neb. 66, 273 N. W. 836; *Voss v. Voss*, 144 Neb. 819, 14 N. W. 2d 849.

.Plaintiff predicates error in that the defendant arbitrarily set up an amount of $50 a month for expenses for the years 1938, 1939, 1940 and 1941, and, inasmuch as this action was reopened on June 12, 1943, hearing also included an accounting on the net profits for 1942. For the first four years mentioned the amount was shown to be $2,435.20, and, in addition, checks were issued to the defendant totaling $855.11, and other items totaling $566.92, making a total for the years 1938 to 1941, inclusive, of $3,857.23. The trial court granted this allowance. These expenses were for traveling purposes and for contacting and entertaining customers and attending trade meetings, to procure and induce customers to purchase the defendant's products. The record discloses that in February, 1940, the plaintiff accepted the amount of $212, tendered by defendant as plaintiff's share of the profits under the contract for the years 1938 and 1939, based on quarterly reports, and the plaintiff accepted from the defendant a credit memorandum for the amount agreed on; thus consummating a full and complete settlement for those years. In this settlement plaintiff recognized the arbitrary deduction of $50 a month, made by defendant and for the purposes for which he made such deductions. Plaintiff offered no complaint. By the nature of the business the trial court concluded from all of the evidence with reference to the foregoing amount that

the sum constituted a reasonable and fair amount for such purposes and likewise constituted a legitimate business expense.

In the light of plaintiff's knowledge of the deduction made for the years 1938 and 1939, and in light of admissions in the record that certain amounts were necessary for such purposes, we conclude that such amounts were reasonable and fair amounts to be expended for such purposes.

The defendant, by cross-petition, alleges that under the contract of sale, which included equipment, merchandise, formulas, trade-marks and goodwill, the products manufactured and sold by the Shepard Laboratories consisted largely of liquid and dried insecticides for garden and household use, were marked with the trade name of "Sheps," and were identified by labels, in advertising matter, by displaying this name in script, and a figure representing a shepherd, in biblical costume, holding in his hand a shepherd's crook. Defendant further alleges that the plaintiff used and is still using the same trade name and trade-mark in marketing in the trade territory certain harness oil and other products, sold to the same customers and in containers similar in size and appearance; that the plaintiff's quality of merchandise has been inferior and unsatisfactory to the consumer and the plaintiff is unwarranted in using such trade-marks, because it caused confusion and uncertainty in the minds of the buying public. The defendant prays that the action for accounting be denied, and that he be granted a permanent injunction, forbidding the use of the name "Sheps" and the formulas described in labeling his products.

The court decreed that at the time of the sale of the business the trade-marks used in such business, and as described in defendant's cross-petition, were sold to the defendant absolutely, and included the exclusive right to the defendant to use such trade-marks, and that the plaintiff should discontinue using them in connection with any merchandise manufactured and sold by him as soon as the supply of labels he had on hand was exhausted; then decreed that the plaintiff violated the agreement by continuing to

use such trade-marks, causing defendant a great deal of inconvenience and substantial damage, and granted a permanent injunction.

The trade-marks and trade names were not registered as such under the laws of the United States or under the laws of the state of Nebraska, so there is no question involved of prior registration or infringement of a registered trademark or trade name.

Defendant relies upon the first part of the contract, viz.: "I, R. W. Shepard, owner of the Shepard Laboratories hereby enter into a contract to sell to Anson Shepard, the Shepard Laboratories consisting of * * * trade marks and good will." The plaintiff agrees that the trade-marks incidental to the Shepard Laboratories were sold to the defendant. However, the trade-marks incidental to his separate business used before and after the sale were not sold or intended to be sold to the defendant. The plaintiff organized a business in 1925 in Council Bluffs, Iowa, under the name of Neatslene Harness Oil Company, later changing the name to Neatslene Leather Oil Company, and in November, 1933, moved the business to Omaha, Nebraska, and continued to operate it. In 1940 the name was changed to Neatslene Company (hereinafter referred to as "Neatslene"). For a number of years the defendant was employed by the plaintiff for Neatslene and Shepard Laboratories. The principal products manufactured and sold by Neatslene in 1925 were "Sheps No. 1 Neatsfoot Oil," "Sheps Prime Neatsfoot Oil" and "Sheps Commercial Neatsfoot Oil." In 1925 the plaintiff secured from the Nourse Oil Company the brands of "Swat-the-Fly Spray," "Kill-Dust Sweeping Compound," and in 1926 additional items of "Sheps Barnyard Spray" and "Sheps Household Spray," using the same insignia upon these sprays as was being used on the Neatslene products.

In 1927 Shepard Laboratories was incorporated, and the corporation was dissolved in 1930, and since such time, and until the contract of sale of Shepard Laboratories was entered into on January 1, 1938, the plaintiff was the sole

owner of both businesses. The word "Sheps" adopted as a trade-mark by Neatslene was used in the fall of 1925 and 1926. In 1927, when Shepard Laboratories was organized, the same name was applied to the insecticides and sprays as above set out. In 1934 a new trade-mark was adopted exclusively by Shepard Laboratories, and has never been used by Neatslene. In 1934 Shepard Laboratories' trade-mark was used in "Sheps" household spray and other sprays of a similar character under the "Shep" name. Neatslene manufactured and sold leather oils at wholesale for ultimate use by farmers and the dairy trade, with the exception of cutting oil and rust preventative. Products of Shepard Laboratories were insecticides, sold at wholesale for ultimate use by farmers and the dairy trade. The products of the two separate companies bear no relation one to the other and are dissimilar in character and kind and not competitive. After the sale of Shepard Laboratories the two brothers continued their respective businesses in the same building, using the same bookkeeper and the same safe, with separate books for each company, which plaintiff had a right to investigate. Under the terms of the agreement, they were to co-operate with each other in the sale of their separate products. This they did by traveling together on several occasions and selling to and having accounts with the same customers. Some criticism attached to the products sold by Neatslene, and complaint was made to Shepard Laboratories, the complainants believing the products were those of the Laboratories. This constituted the confusion claimed by defendant. These incidents were not many and were for the most part corrected. An examination of the trade-marks discloses a dissimilarity, in size and color and in the insignia used, which is discernible as attached to product. The name "Sheps" predominates on the products of each company.

We conclude that the plaintiff did not sell to the defendant exclusive use of the trade-marks so that he would be denied the use of those that identify his products and are incident to his business. The trade-marks are dissimilar,

and the two separate businesses are dissimilar and not competitive.

"A 'trade-mark' may be defined as a name, sign, symbol, or device which is attached to goods offered for sale in the market so as to distinguish them from similar goods, and to identify them with a particular trader, or with his successors, as owners of a particular business, as being made, worked on, imported, selected, certified, or sold by him or them." 63 C. J., sec. 1, p. 308.

"The right to the exclusive use of a trade-mark is not unlimited. Its use on one or more commodities does not give the right to use it on all, for the right to the exclusive use of a trade-mark is limited to a use on the particular class of goods on which it has been actually used, and other persons may use even the identical mark or name in connection with a different class of goods." 63 C. J., sec. 10, p. 317.

In *Basket Stores v. Allen,* 99 Neb. 217, 155 N. W. 893, this court held: "When the owner of a trade-mark applies for an injunction to restrain a competitor from injuring his property by making false representations to the public, it is essential that the complainant and the defendant should both be engaged in the sale of the same kind of goods." And it was held in *Regent Shoe Mfg. Co. v. Haaker,* 75 Neb. 426, 106 N. W. 595: "But, to constitute an infringement on a trade-name, it is necessary that the two places of business be in actual competition with each other; * * * ."

The whole question of injunction relating to trade-marks and trade names in the case at bar resolves itself into: (a) Whether the plaintiff and defendant were competitors; and (b) whether they sold the same kind of goods. The business of plaintiff and defendant was for many years co-operative. The trade-marks used on these different products were distinctive in character and always bore the name of the contents of the package. There is no unfair competition and unfair trade which would warrant an injunctive remedy. The permanent injunction granted defendant on his cross-petition as to trade-marks and trade names should be dissolved.

The trial court decreed that the plaintiff recover from the defendant,. on the items taken into consideration in the accounting and the percentage of profits for the years 1938 to and including 1942, the sum of $534.18, including interest. The judgment should be modified by deducting from the credit, allowed the defendant against the 20 per cent net profits due plaintiff, the family expenses considered, amounting to $60, and, in addition, the 20 per cent of the 200-dollar attorneys' fees, credited to the defendant and charged to the plaintiff as against his 20 per cent of the net profits, or an amount of $40; motion to retax costs to be sustained; costs to follow the judgment; the permanent injunction granted to be dissolved, and in all other respects, the decree and judgment are affirmed.

AFFIRMED AS MODIFIED.